1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

9 SUZE ADAMS,                                    1:10-cv-02110-OWW-DLB (HC)

10                        Petitioner,            FINDINGS AND RECOMMENDATION
                                                 REGARDING PETITION FOR WRIT OF
11          v.                                   HABEAS CORPUS

12                                               [Doc. 1]
    TINA HORNBEAK,
13
                           Respondent.
14 _____/

15
16          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
17 pursuant to 28 U.S.C. § 2254.

                              RELEVANT HISTORY
18
19          Following a jury trial in the Stanislaus County Superior Court, Petitioner was convicted
20 of two counts of arson of an inhabited structure (Cal. Penal Code[1] § 451(b)), murder (§187), and
   three counts of attempted murder (§§ 664/187.)  For the murder and attempted murder charges,
21 the jury found true the allegation that the crimes were premeditated.  The jury also found true the
22 special circumstance allegation that the murder was committed during an arson (§ 190.2(a)(17)).
23 Petitioner was sentenced to life without the possibility of parole for special circumstance murder
24 (§§ 187, 190.2(a)(17)).  Petitioner was sentenced to a consecutive five-year term for arson of an
25 inhabited structure (§ 451(b)) and a consecutive life term with the possibility of parole for each
26 of the attempted murder (§§ 664, 187) counts, to run concurrent to each other.
27
   _____
28          [1] All further statutory references are to the California Penal Code unless otherwise indicated.

                                                  1

1    Petitioner appealed to the California Court of Appeal, Fifth Appellate District.  The Court

2  of Appeal affirmed the judgment in a partially published opinion on December 30, 2008 (People

3  v. Adams, 169 Cal.App.4th 1009 (2008); Lod. Docs. 4, 5 and Exs. 1 [partially published opinion]

4  and 2 [full opinion].)

5    On January 16, 2009, Petitioner filed a Petition for Rehearing in the California Court of

6  Appeal.  On January 26, 2009, the Court of Appeal denied the Petition for Rehearing.

7    On February 24, 2009, Petitioner filed a Petition for Review in the California Supreme

8  Court.  The California Supreme Court summarily denied the petition on April 7, 2009.

9    Petitioner filed the instant petition for writ of habeas corpus on November 5, 2010.  On

10  March 17, 2011, Respondent filed an answer to the petition.  Petitioner filed a traverse on July

11  11, 2011.

12                                STATEMENT OF FACTS[2]

13    Prosecutor's Case

14    A.  The Fires

15    On March 25, 2004, Jerry McDaniel, the fire marshal for the City of
   Turlock, was dispatched to the scene of a fire.  The fire was already out, and
16  McDaniel spoke with the fireman in charge, Captain Becker.  McDaniel and
   Becker determined that the fire originated from the wooden front porch and front
17  wall of the house.  McDaniel originally concluded that the cause of this fire was
   "undetermined" because "cigarette butts in the area" could have accidentally
18  ignited the fire.

19    On June 18, 2004, McDaniel was dispatched to the same house, again
   meeting with Becker, who related that a young man at the scene had advised that
20  his mother was still inside the home.  McDaniel did a "brief walk around" and
   "clearly" saw "there were two separate fires set" at the house, one at the backdoor
21  and one on the front porch.  Both fires grew "up and out," extending into the
   house until intersecting, consuming much of the house and causing the front
22  porch, the roof, and "all the floorboards" in the house to collapse.  The reason the
   second fire was "much more intense" than the first was a heavier "fuel content" or
23  "fuel package" on the front porch, in that a large stuffed chair and recliner caught
   fire.  The fire at the back door started where "[i]gnitable fluid was poured."  The
24  body of the young man's mother was found in the bathroom.

25    Found in some trash cans in the area were two "one gallon Ziplock seal-a-
   meal type bags" containing what looked like pine needles.  The bags emitted an
26

27    [2] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth
   Appellate District appearing as Exhibit 2, of the Answer to the Petition for Writ of Habeas Corpus.
28

                                            2

"odor of a cleaning fluid or paint thinner." Samples of the contents of these bags were sent to the Department of Justice for analysis, and the samples were determined to be "rosemary and alcohol."

McDaniel concluded that both the March 25 and June 18 fires were the result of arson.

B. The Victims and the Suspect

Witness interviews showed that the deceased female, Kristina Soult, was in the home at the time both fires were started. Present at the time of the first fire were Soult, Joseph Lopes, and Lopes's girlfriend. They managed to escape through the back door of the house. Present for the second fire were Lopes, Andrea Marr, who was Soult's friend, and J.V., who was Soult's grandson and Lopes's nephew.

During the second fire, Lopes stated that he was asleep on a couch when he was awakened "by heat and light coming through the front window." He got up, woke up everyone else in the house, and tried to get them out. He last saw his mother in the hallway, when she handed J.V. to Andrea. He, Andrea, and J.V. exited the house through the back door, which was "already hot to the touch." Upon opening the door, the "fire rolled in on the floor making it difficult to get out." After exiting the house, he realized his mother was still inside.

Turlock Police Detective Morgan attended Soult's autopsy on June 18, 2004. Later that day, he got an anonymous telephone call from a woman subsequently determined to be the wife of David Jaen. The next day, he got an anonymous telephone call from a man who was subsequently determined to be Jaen. He met with Jaen and, as a result, came to consider Adams a suspect in Soult's death.

Both Jaen and Adams were Cooks who worked at the same restaurant in Turlock. Jaen also had worked with Soult around 2002 or 2003, in another restaurant. According to Jaen, Adams never told him that she was scared of Soult. Shortly after the first fire at Soult's house, Jaen learned about it from Soult's son, Joseph Lopes. He mentioned to Adams that someone had tried to burn Soult's home, and she responded that the "[s]econd time around she'll do better." About a week before the second fire, Soult came into the restaurant and ate, which made Adams "furious." After the second fire, Jaen immediately suspected Adams because of her statements about the first fire.

Detective Morgan determined that the distance between Adams's and Soult's homes was about "a mile and a half." On June 20, 2004, he searched Adams's residence pursuant to a search warrant and found "numerous rosemary needles throughout" the home. He interviewed Adams on June 20, 2004. Adams told him that Soult had phoned her repeatedly and followed her, but she denied being afraid of Soult, who she thought might have been mentally ill. She admitted that her boyfriend, Fortino Godoy, still had contact with Soult before Soult died and that "she didn't like it."

On June 21, 2004, Detective Morgan searched the dumpster next to Adams's apartment and found a "bundle of branches of rosemary, ... wrapped with a piece of twine or cord. He later learned that Adams had picked up her paycheck, and that she had left that day for Tijuana.

On July 2, 2004, Detective Morgan again interviewed Adams who indicated that had just returned from Tijuana.  He saw that she had put her hair in a "bob" and bleached it blond.

C.  The Polygraph Examination

On August 4, 2004, Jeannie Brandon, a polygraph examiner with the California Department of Justice, conducted a voluntary and videotaped polygraph examination of Adams.  A DVD of the interview was played for the jury, which was also provided with copies of the transcript of the interview.

According to the transcript, Brandon advised Adams at the outset of her "constitutional rights," obtained Adams's agreement to waive those rights, and informed Adams that she could change her mind and terminate the polygraph exam at any time.  Brandon informed Adams that the polygraph exam was being given in conjunction with the investigation into the death of Soult.  Brandon warned Adams that it was not wise to try to life and beat the polygraph.  Brandon stated that although the case was classified as a homicide, it was possible that whoever started the fire did not intend to kill Soult, but intended only to scare her.

Adams told Brandon that she did not know Soult that well and was acquainted with her only because Soult had previously dated her boyfriend, Godoy.  Adams stated that Godoy had pretty much stopped seeing Soult when he started dating her, but was still seeing Soult sometimes.  Adams initially denied setting a fire at Soult's home on the night of June 18, 2004, and denied knowing who did.  When asked if she suspected anyone, she mentioned Soult's youngest son's friend.

Brandon mention ed an earlier fire at Soult's home and stated that someone had phoned the police with a tip, suggesting that Adams had made comments that Adams had started the first fire, and that next time, she would do it more professional, such as by means of Molotov cocktail.  Adams initially claimed to have no idea what this tip was about, then denied making any comment about a Molotov cocktail, then claimed that all she said was that "'if'" she was to do it, she would do it right."  Adams claimed that she was merely joking or bragging.

Brandon suggested that "two sets" of "pretty good" fingerprints had been left at the crime scene, and Adams denied they were hers.  Adams stated that she did not known who killed Soult or why, but expressed doubt that Soult's death was intended.  Adams related that Soult did not take it well when Godoy broke up with her, stating that Soult "used to call my house and threaten me all the time."  Adams claimed that she would "simply hang up."   Soult "sometimes" phoned Adams on a daily basis, and the most recent call was about a week before Soult's death.  Adams "should have" called the police.

Adams told Brandon that she was afraid of Soult.  Soult had followed her home from work in a car and had called her "Susie Q."  Soult also had followed her to work when she was being driven by Godoy.  Soult even had come to Adams's workplace a few times, most recently on the Monday before the fatal fire, but did not say anything.

Adams initially claimed to have worked on the night of June 17, 2005.  Godoy had picked her up from work and they watched a movie at her apartment,

then went to sleep together, getting up the next morning at around 9:00 or 9:30 a.m.  They heard about the fire and Soult's death when "[s]ome guy that walks around and collects cans" told Godoy about it that morning.  After learning about Soult's death, Adams stated that she never went back to her job, and instead decided to go on vacation to "San Diego and Tijuana" with a friend.

After Brandon gave Adams the polygraph exam, Brandon informed Adams that "deception" was "indicated," meaning that Adams was "not telling the truth about this fire over there."  Brandon again suggested that the fire could have been set by a person who "made a mistake" and "acted without thinking," as opposed to a person who did it to "hurt people."  Brandon suggested that Soult "pushed" Adams to the point that she "couldn't take it anymore," and opined that Adams had not "meant for this to happen ... for her to die," and then asked, "Did you?"  Appellant responded, "No."  Brandon asked, "What...happened?"  Adams ultimately responded, "I don't know.  It's like you said.  It got out of control."  Adams ultimately responded, I don't know.  It's like you said.  It got out of control."  Adams explained that she did not "do it" just so that she could have Godoy, agreeing with Brandon that she did "it" because Soult "was being a bitch" and driving her "nuts."  She finally "snapped" when Soult phoned her and called her "a ugly fucking bitch and stuff like that."

Adams related that she went to Soult's house by herself, denying that Godoy was involved.  Soult's home was not dark, and Adams did not know if the occupants of the home were asleep.  She "took Rosemary and dried it and soaked it in rubbing alcohol for over a week, if not more," which made it "very flammable."  She then put it on a chair on the front porch of the house and "lit it on fire" with a match.  She then went to the back of the home and did "[t]he same thing," scattering the flammable material, which was in a plastic bag, around the back door and setting it on fire with a match.  She walked to and from Soult's home.  When she got back to her own home, Godoy was still asleep, as "he sleeps pretty heavy."  She claimed that she did not mean to kill Soult and considered it to be a case of "temporary insanity" because Soult, who was "psycho," was driving her nuts and causing her to fear for her own life.  She felt "horrible" when she learned the next morning that Soult was dead and took off to Mexico because she was "scared."  She admitted starting the first fire on the front porch at Soult's home in March of 2004, stating that she also used rosemary "[s]oaked in rubbing alcohol" on that occasion.  During the fatal fire, she "did the back first" and "then the front."  It was about 3:30 a.m. on Friday morning, and the lights and TV were on inside the home.  She threw two plastic bags that she used to carry the flammable liquid over a fence.  She walked from her home to Soult's home along the railroad tracks that ran through town.  Although she lit the fires at both the front and back of the house, she thought the occupants could still get out through a window.

Detective Moran was watching the polygraph examination on closed-circuit television.  He entered to speak with Adams.  He questioned her about: 1) the rosemary soaked in alcohol; 2) her route to Soult's house; 3) Godoy's lack of awareness of her act; 4) the order in which the two fires had been set; and 5) whether she had encountered anyone.  As for why this had occurred, Adams stated that Soult had been calling her for more than two years, and that it had "always been bad.  Extremely."

5

*Defense Case*

Detective Morgan interviewed Soult's son, Lopes, on June 18, 2004. Lopes stated that his mother would sometimes phone and threaten Adams, saying things like "Susie Q, do you want to come out and play with me?" He said that the two women were supposed to meet at a park "to fight," but Adams did not show up. He stated that, two days earlier, his mother had bragged that she had followed Adams and Godoy to Adam's job. He said that the last time he saw Godoy at his mother's house was three weeks ago.

Detective Morgan also interviewed Glenda Olesen, a friend of Soult. Olesen said that Soult had told her that Soult, 1) had called Adams to tease and threaten her, and 2) had followed Adams and Godoy to Adam's job.

A custodian of record for Soult's cellular telephone company testified that the call detail records indicated that Soult had made two telephone calls to Adams from the cellular telephone in May of 2004.

Adams testified on her own behalf. She stated that she had first met Godoy around 1999, when they were both working at the same restaurant in Turlock. They became romantically involved about four or five months later and remained involved for four or five years. When they first became romantically involved, Godoy was still living with Soult, but he told her that he and Soult were no longer romantically involved and were just friends. Soult made many threatening phone calls to Adams during those four or five years that Adams dated Godoy. It was "very unusual" if Adams did not get such a call "for a couple of weeks." Soult usually left messages, but Adams would sometimes answer and hang up. Soult also came to the restaurant where Adams worked as a cook and make comments to the waitresses like, "I don't want that bitch cooking my food."

Adams described an incident where she was walking home from work when Soult pulled up in the passenger seat of a car and said, "Hey Susie Q., I'm going to kick your ass, and I'm going to make it so bad that Fortino will never be able to be with you again." Adams went into a park, hoping to "escape that way," but Soult tried to head her off, so she took another route to her apartment. When she finally got to her home, Soult was waiting for her, so she had to hide for 20 to 30 minutes until Soult finally left.

According to Adams, when she gave her initial statement to Detective Morgan, she downplayed her problems with Soult because she thought that it would make her "look more guilty or suspicious." Later, she went to Mexico with a friend for a week and came back and "took the polygraph," as shown by the DVD that was played for the jury.

Adams asserted that the comments that the polygraph examiner made to her, suggesting "maybe it was an accident and somebody didn't mean to kill, led her to believe "they wouldn't, like, press such harsh charges on me, that things wouldn't be so bad for me."

(Lod. Doc. 5 at 3-11.)

DISCUSSION

I.    <u>Jurisdiction</u>

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting <u>Drinkard v. Johnson</u>, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    <u>Standard of Review</u>

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Federal habeas relief may not be granted for claims subject to § 2254(d) unless it is shown that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of [the Supreme] Court." <u>Harrington v. Richter</u>, __ U.S. __, 131 S.Ct.

7

770, 785 (2011) (citing 28 U.S.C. § 2254(d)(1) and Williams v. Taylor, 539 U.S. 362, 412

(2000). Habeas relief is also available if the state court's decision "involved an unreasonable

application" of clearly established federal law, or "was based on an unreasonable determination

of the facts" in light of the record before the state court. Richter, 131 S.Ct. 785 (citing 28 U.S.C.

§ 2254(d)(1), (d)(2)). "[C]learly established ... as determined by" the Supreme Court "refers to

the holdings, as opposed to the dicta, of th[at] Court's decisions as of the time of the relevant

state-court decision." Williams v. Taylor, 529 U.S. at 412. Therefore, a "specific" legal rule

may not be inferred from Supreme Court precedent, merely because such rule might be logical

given that precedent. Rather, the Supreme Court case itself must have "squarely" established that

specific legal rule. Richter, 131 S.Ct. at 786; Knowles v. Mirzayance, __ U.S. __, 129 S.Ct.

1411, 1419 (2009). Moreover, the Supreme Court itself must have applied the specific legal rule

to the "context" in which the Petitioner's claim falls. Premo v. Moore, __ U.S. __, 131 S.Ct.

733, 737 (2011). "A state court's determination that a claim lacks merits precludes federal

habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

decision." Richter, 131 S.Ct. at 786.

"Factual determinations by state courts are presumed correct absent clear and convincing

evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court

and based on a factual determination will not be overturned on factual grounds unless objectively

unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."

Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254

apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v.

Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501

U.S. 979, 803 (1991). However, "[w]here a state court's decision is unaccompanied by an

explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

basis for the state court to deny relief." Richter, 131 S.Ct. at 784.

III.     Instructional Error

Petitioner contends that "the three counts of attempted murder must be reversed, because a combination of instructional flaws, prosecutorial misconduct, and ineffective assistance of counsel, permitted verdicts of guilty without a finding that there had been an intent to kill any of the three named persons."  Petitioner contends her conviction of attempted murder was unlawfully based on a theory of transferred intent, instead of specific intent to kill.

A.     Last Reasoned State Court Decision

The California Court of Appeal, Fifth Appellate District, issued the last reasoned decision denying the claim stating:

> Adams also contends that the three attempted murder convictions should be reversed because there was no finding that she had an intent to kill Lopes, Andrea Marr, or J.V.  Adams contends that the jury was improperly instructed on the issue of attempted murder and "kill zone" under CALCRIM No. 600, that the prosecutor misstated the law in closing arguments, and that defense counsel failed to properly object.

> Here, the jury was instructed on the attempted murder charges under a modified version of CALCRIM No. 600 as follows:

> "To prove that the defendant is guilty of attempted murder, the People must prove that, one, the defendant took direct but ineffective steps towards killing another person.

> "And two, the defendant intended to kill that person. [¶] ... [¶]" Adams does not challenge this part of the jury instruction.  (See *People v. Lee* (2003) 31 Cal.4th 613, 623, 3 Cal.Rptr.3d 402, 74 P.3d 176 ["Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."].)

> However, the jury was further instructed as follows:

> A person may intend to kill a specific victim or victims, and at the same time intend to kill anyone in a particular zone of harm or kill zone.  In order to convict the defendant of the attempted murder of Joseph Lopes, [J.V.], and Andrea Marr, the People must prove that defendant not only intended to kill Kristina Soult, but also intended to kill Joseph Lopes, [J.V.], and Andrea Marr, or intended to kill anyone within the kill zone.

> "If you have a reasonable doubt whether the defendant intended to kill Joseph Lopes, [J.V.], or Andrea Marr, or intended to kill Kristina Soult by harming everyone in the kill zone, you must find the defendant not guilty of attempted murder."

> Adam's defense counsel had argued that "Adams did not know anybody lived in that house except for Kristina Soult."  The prosecutor responded as follows: "And, again, I want to bring up the point of attempted murder with a kill

zone.  You don't have to know about the other people there."

Adams contends that the prosecutor's argument misstated the law on attempted murder by means of a kill zone and that the latter part of CALCRIM No. 600, which is based upon the "concurrent intent" theory enunciated by the California Supreme Court in *People v. Bland* (2002) 28 Cal.4th 313, 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107 (Bland), is ambiguous because it does not fully state or explain the law of attempted murder since it permits conviction on attempted murder even if Adams was not aware of the presence of the alleged attempted murder victim.

In *Bland*, the California Supreme Court held that the doctrine of "transferred intent" applies to murder but not to attempted murder.  (*Id.* at p.327, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)  "In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another.  The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder."  (*Id.* at p.317, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)  However, the California Supreme Court also recognized that "a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim.  Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 745-746, 37 Cal.Rptr.3d 163, 124 P.3d 730 (*Smith*).)

In explaining the concurrent intent theory, the California Supreme Court quoted the following language:

"'The intent is concurrent...when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.  For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed.  Similarly, consider a defendant who intends to kill A, and in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group.  The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.  When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death.  The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A.  Where the means employed to commit the crime against the primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.  This situation is distinct from the "depraved heart" [i.e., implied malice] situation because the trier of fact may infer the actual intent to kill which is lacking in a

10

"depraved heart" [implied malice] scenario.' [Citation.]" (*Bland, supra*, 28 Cal.4th at pp. 329-330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)

"A kill zone, or concurrent intent, analysis, therefore, focuses on (1) whether the fact finder can rationally infer from the type and extent of force employed in the defendant's attack on the primary target that the defendant intentionally created a zone of fatal harm, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm. [Citation.]" (*Smith, supra*, 37 Cal.4th at pp. 755-756, 37 Cal.Rptr.3d 163 (Werdergar, J., dissenting).)

In *Smith*, the California Supreme Court held that multiple attempted murder convictions could be supported by evidence that the defendant fired a single bullet at two victims even without using a concurrent intent theory. (*Smith, supra*, 37 Cal.4th at p.746, 37 Cal.Rptr.3d 163, 124 P.3d 730.) In *Bland*, the Supreme Court concluded that multiple attempted murder convictions could be supported under a concurrent intent theory by evidence that the defendant used means that created a zone of harm or a kill zone, such as a hail of bullets or an explosive device. (*Bland, supra*, 28 Cal.4th at pp. 329-330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Thus, it is the means used that distinguishes attempted murder under a concurrent intent theory from "normal" attempted murder.

Where it may be concluded that a defendant has knowledge of the presence of other victims, coupled with the specific intent to kill, that has generally been sufficient to support a reasonable inference that the defendant intended to kill the attempted murder victims. Thus, in Smith, the California Supreme Court noted that "where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim," "a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in th zone of fatal harm." (*Smith, supra*, 37 Cal.4th at p. 746, 37 Cal.Rptr.3d 163, 124 P.3d 730 (italics added).) However, we do not agree with Adam's argument that the California Supreme Court's observations on the kill zone theory in Smith implies that knowledge of the presence of the alleged murder victims is required before a defendant can be convicted of attempted murder of those persons.

First, the observations were mere dicta as the Smith Court concluded that the attempted murder convictions in that case could be sustained without reference to the kill zone theory. (See *Smith, supra*, 37 Cal.4th at p. 746, 37 Cal.Rptr.3d 163, 124 P.3d 730.) Second, the fact that a rational jury could conclude that a defendant who knows of the presence of the victims, which was the factual scenario in Smith, had the necessary express malice does not preclude a rational jury from concluding that a defendant who does not know of the presence of the victims also had the necessary express malice if the jury found that the defendant intentionally created a zone of harm and that the victims were in that zone of harm. Rather, the concurrent intent doctrine permits a rational jury to infer the required express malice from the facts that: (1) the defendant targeted a primary victim by intentionally creating a zone of harm, and (2) the attempted murder victims were within that zone of harm. The concurrent intent theory recognizes that the defendant acted with the specific intent to kill anyone in the zone of harm with the objective of killing a specific person or persons. The theory imposes attempted murder liability where the defendant intentionally created a kill zone in order to ensure the defendant's primary objective of killing a specific person or persons despite the recognition, or with acceptance of the fact,

11

that a natural and probable consequence of that act would be that anyone within that zone could or would die.  Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were with the zone of harm.  (See, e.g., *People v. Vang* (2001) 87 Cal.App.4th 554, 563-565, 104 Cal.Rptr.2d 704 [evidence was sufficient to support attempted murder convictions of inhabitants of residence even though defendants could not see all of their victims because defendants sprayed wall-piercing bullets at residences].)

From the evidence, a rational jury could infer that Adams had the necessary express malice for attempted murder because: (1) Adams had the express intent to kill Soult by intentionally creating a zone of harm or kill zone, in that Adams set fires at both the front and back of the house, and (2) that Lopes, J.V., and Marr were within that zone of harm.  Thus, we reject Adams's argument that her attempted murder convictions should be vacated because she was not aware of the presence of persons other than Soult at the house.

(Lod. Doc. 5 at 15-20.)

## B.    Instructional Error of Applicable State Law

Petitioner challenges the state court's interpretation of the "kill zone," and argues the state court failed to follow the holding in People v. Bland, 28 Cal.4th 313 (2002) or other applicable California law in applying that theory.  Federal habeas corpus review is not available to challenge the state court's determination of questions of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  Furthermore, on habeas review this Court must defer to a state court's determination of state law.  Bradshaw v. Richey, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); see also Hicks v. Feiock, 485 U.S. 624, 629-630 & n.3 (1988) (noting generally that state court's determination of state law is binding and must be given deference).  Therefore, this Court is bound by the state court's determination of its own law, and Petitioner's claim regarding the "kill zone" theory is not cognizable on federal habeas review.

## C.    Prosecutorial Misconduct

Petitioner contends the prosecutor engaged in misconduct by arguing that Petitioner was guilty of attempted murder even if she did not know that anyone other than the intended target was present in the "kill zone."

A habeas petition will be granted for prosecutorial misconduct only when the misconduct

1    "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

2    Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (*quoting* Donnelly v.

3    DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see, Bonin v. Calderon, 59 F.3d

4    815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct

5    must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."

6    Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (*quoting* United States v.

7    Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)).  Under this standard, a petitioner must show that

8    there is a reasonable probability that the error complained of affected the outcome of the trial -

9    i.e., that absent the alleged impropriety, the verdict probably would have been different.

10       In this case, the prosecutor did not misstate the law on the "kill zone" theory of

11   culpability.  The prosecutor argued that Petitioner was guilty of attempted murder even if she did

12   not know of the presence in the "kill zone" of anyone other than the intended target.  The state

13   court found that this was a correct interpretation of California law, and this Court is bound by

14   such ruling.  Accordingly, there is no merit to Petitioner's claim that the prosecutor committed

15   misconduct.

16       D.    Ineffective Assistance of Counsel for Failing to Object

17       Petitioner claims that defense counsel rendered ineffective assistance by failing to object

18   to the prosecutor's misstatement of the law concerning the "kill zone" theory of attempted

19   murder.

20       The law governing ineffective assistance of counsel claims is clearly established for the

21   purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

22   151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

23   assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

24   668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

25   the petitioner must show that counsel's performance was deficient, requiring a showing that

26   counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

27   the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

28   representation fell below an objective standard of reasonableness, and must identify counsel's

13

alleged acts or omissions that were not the result of reasonable professional judgment

considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

(9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive

defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

(2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

have been different.

A court need not determine whether counsel's performance was deficient before

examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

prejudice, any deficiency that does not result in prejudice must necessarily fail.

As explained above, because the prosecutor did not misstate the law regarding the

"killing zone" theory, there was no basis for counsel to object and any objection would have been

futile.  The failure to raise a meritless objection does not constitute ineffective assistance of

counsel.  See James v. Borg, 24 F.3d 20, 27 (9th Cir. 1994).  Therefore, there is no merit to

Petitioner's claim that counsel was ineffective.

IV.    Admission of Confession in Violation of Fifth Amendment Right to Remain Silent

Petitioner contends her confession to the polygrapher was improperly admitted in

violation of the Fifth Amendment.

A.    Last Reasoned State Court Decision

The California Court of Appeal, Fifth Appellate District denied the claim on the merits as

follows:

### A.   Factual Background

During the polygraph examination on August 4, 2004, after informing Adams about Adams's constitutional rights to not answer, Brandon asked Adams: "So do you wanna talk?"  Adams stated: "So I'm scarin' ya (Unintelligible)." Adams: "Yeah (chuckles)."  Later, Brandon stated: "[I]f there is anything I can do to make it easier for you, I will.  Or anything I can do to help you out with all this."  Adams: "Uh-huh."  Brandon: "That cop out there is not gonna go away." Brandon then stated that she had "gone to bat for some people that most people would tell you are monsters," and that these people weren't monsters to her but people who made a mistake and did something wrong.  However, all these people had to do was to be truthful with her, and they had her respect.

Thereafter, Adams left the room briefly to smoke.  Upon her return, Brandon made the following statements: "I'd like to 'em close this case and go on. I think, and again I could be wrong, but I think a bad accident happened.  And I think that there's somebody out there that acted on impulse, and did some 'em some crazy, and then went, my God, never thought that would happen, and then when it did happen, they're scared to death.  I know I would be.  And if I could just get to that person.  You know there's ... there's only one way out of situations. And it's the truth.  You know that...[Adams: "Yeah."]...as well as I do.  But if that person can just take that first step, as scary as it is, things have a way of getting worked out."  Adams then responded: "Okay, let's do it."  Adams then made her statements to Brandon and was then interviewed by Detective Morgan.

(Lod. Doc. 5 at 12.)

### B.   The state court's opinion

Adams first contends that her statements to Brandon should have been suppressed because Brandon failed to honor her invocation of her Fifth Amendment right to remain silent when Adams stated "I think I'm gonna change my mind."  Essentially, Adams is contending that her Fifth Amendment rights were violated even though she was not in custody at the time.  Although there can be no Miranda violations where appellant was not in custody, see *Stansbury v. California* (1994) 511 U.S. 318, 322, Adams is making a Miranda-like claim based upon the "underpinnings" of the Fifth Amendment.  We are unclear whether appellant can make such a claim, but, if appellant can make such a claim, we would analyze it under the traditional analysis of similar Miranda claims because the claim is analogous.  Thus, Adams must invoke her right to remain silent in a clear and unambiguous manner.  (*People v. Stitely* (2005) 35 Cal.4th 514, 535.)  If the invocation is unclear, an officer, acting in good faith, can ask additional questions to attempt to clarify the situation.  (*People v. Wash* (1993) 6 Cal.4th 215, 238.)  Here, the statement "I think I'm gonna change my mind" is not a clear and unambiguous invocation of the right to remain silent because it allows for the possibility that Adams had not made up her mind because she was still thinking about challenging her decision to answer questions.  (See, e.g., *People v. Stitely*, supra, 35 Cal.4th at p. 534 [suspect's statement "I think it's about time for me to stop talking" did not amount to an invocation of the right to remain silence because it was equivocal]; *People v. Wash*, supra, 6 Cal.4th at p. 238 [suspect's statement "I don't know if I wanna talk anymore" did not constitute invocation and was sufficiently ambiguous]) Thus, the polygraph examiner could continue to ask questions and make comments to clarify whether Adams was truly invoking

her Fifth Amendment rights.  The fact that, as interpreted by Adams, the polygraph examiner embarked on an effort to get Adams to confess does not mean that the polygraph examiner thought that Adams had clearly and unambiguously invoked her rights.  Rather, it could mean that the polygraph examiner thought that Adams might have invoked her right and wanted to make sure that Adams clearly and unambiguously did so.  Thus, we rejected Adams's claim of a *Miranda*-like violation.

(Lod. Doc. 5 at 12-13.)

Under Miranda, a person in custody must be informed before interrogation that he has a right to remain silent and to have a lawyer present.  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).  "[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."  Alvarez v. Gomez, 185 F.3d 995, 997 (9th Cir. 1999) (citations omitted).  Whether a suspect has invoked his right to counsel is an objective inquiry.  Davis v. United States, 512 U.S. 452, 458-459, 114 S.Ct. 2350 (1994).  "Invocation of the Miranda right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney."  Id., 512 U.S. at 459 (citing McNeil v. Wisconsin, 501 U.S. 171, 178, 111 S.Ct. 2204, 2209.  "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning."  Id.  Rather, the suspect must unambiguously request counsel.  Id.

In Davis v. United States, the Supreme Court held that a "suspect must unambiguously request counsel" and "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  Id. at 459.  "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officer have no obligation to stop questioning him."  Id. at 461-462.  Nor do they have an obligation to ask clarifying questions.  Id. at 461.  David did not address an ambiguous invocation of the right to remain silence.  However, the Supreme Court just recently extended Davis to the right to remain silent and held that, in order for any interrogation to cease, the

16

1    invocation of the right to remain silent, like the invocation of the right to counsel, must be both

2    unambiguous and unequivocal.  Berghuis v. Thompkins, __ U.S. __, 130 S.Ct. 2250, 2259

3    (2010).  The Supreme Court stated:

4            The Court has not yet stated whether an invocation of the right to remain
         silent can be ambiguous or equivocal, but there is no principled reason to adopt

5        different standards for determining when an accused has invoked the *Miranda*
         right to remain silent and the *Miranda* right to counsel at issue in *Davis*.  See, e.g.,

6        *Solem v. Stumes*, 465 U.S. 638, 648, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984)
         ("[M]uch of the logic and language of [*Mosley*]," which discussed the Miranda

7        right to remain silent,, "could be applied to the invocation of the [*Miranda* right to
         counsel]").  Both protect the privilege against compulsory self-incrimination,

8        *Miranda*, *supra*, at 467-473, 86 S.Ct. 1602, by requiring an interrogation to cease
         when either right is invoked, *Mosley*, *supra*, at 103, 96 S.Ct. 321 (citing *Miranda*,

9        supra, at 474, 86 S.Ct. 1602); *Fare v. Michael C.*, 442 U.S. 707, 719, 99 S.Ct.
         2560, 61 L.Ed.2d 197 (1979).

10

11           There is good reason to require an accused who wants to invoke his or her
         right to remain silent to do so unambiguously.  A requirement of an unambiguous

12       invocation of *Miranda* rights results in an objective inquiry that 'avoid[s]
         difficulties of proof and...provide[s] guidance to officers' on how to proceed in

13       the face of ambiguity. [Citation.] If an ambiguous act, omission, or statement
         could require police to end the interrogation, police would be required to make

14       difficult decisions about an accused's unclear intent and face the consequence of
         suppression 'if they guess wrong.' [Citation.] Suppression of a voluntary

15       confession in these circumstances would place a significant burden on society's
         interest in prosecuting criminal activity. [Citation.] Treating an ambiguous or

16       equivocal act, omission, or statement as an invocation of *Miranda* rights 'might
         add marginally to *Miranda's* goal of dispelling the compulsion inherent in

17       custodial interrogation.' [Citation.] But 'as *Miranda* holds, full comprehension of
         the rights to remain silent and request an attorney are sufficient to dispel whatever
         coercion is inherent in the interrogation process.' [Citation.]

18

19   Id. at 2260.  Berghuis was decided after the state court issued its decision on direct appeal.

20           Petitioner concedes that she was not in custody at the time the polygrapher questioned

21   her.  Nonetheless, the Fifth Amendment protected Petitioner against compelled self-

22   incrimination.  McCarthy, 266 U.S. at 40; Kastigar, 406 U.S. at 444; Lefkowitz v. Turley, 414

23   U.S. at 77.  However, Petitioner must expressly assert the privilege in a timely fashion because

24   the right to remain silent in the non-custodial setting is not self-executing.  Roberts, 445 U.S. at

25   559.  In this instance, Petitioner did not clearly invoke her Fifth Amendment right to remain

26   silent.  In order for habeas corpus relief, Petitioner must demonstrate that clearly established

27   Supreme Court precedent addresses an ambiguous invocation of the right to remain silent outside

28   of the custodial interrogation context warranting relief in this case.  Petitioner has failed to cite

any such authority, nor is the Court aware of such authority.

In any event, the Supreme Court's precedent related to ambiguous invocations of the right to remain silent during custodial interrogations does not assist Petitioner. At the time of Petitioner's conviction and at the time of the state court's decision, there was no clearly established Supreme Court precedent that a suspect's ambiguous statement that might be interpreted as an invocation of the right to remain silent bars all further questioning. The Supreme Court's decision in Berghuis subsequently made clear that, as with the invocation of the right to counsel in Davis, a suspect must invoke his right to remain silent unambiguously. Otherwise, police officers may continue to question him or her and any voluntary confession may be introduced at trial. Berghuis, 130 S.Ct. at 2260. Since the Supreme Court decided Berghuis after the conclusion of Petitioner's direct appeal, the state court did not act contrary to or unreasonably apply Supreme Court precedent in holding that a suspect's assertion of the right to remain silent must be unambiguous. Williams v. Taylor, 529 U.S. at 412 ("clearly established" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision").

Notwithstanding the lack of clearly established federal law, the state court reasonably determined that Petitioner's invocation was not clear and unambiguous. Petitioner's statement, "I think I'm gonna change my mind," was ambiguous and equivocal and could have reasonably meant that Petitioner had not yet made up her mind about talking and was still thinking about it. After Petitioner made the statement, she left the examination room for a cigarette break, voluntarily reentered, and then, after a brief discussion with the polygrapher, said, "Okay, let's do it." (SCT 23-26.) At the time of the interview, Petitioner was not in custody and could have exercised her right to remain silent and not return to the room. Instead, Petitioner freely returned to the room and reinitiated contact with the polygrapher, evidencing her intent to waive her right to remain silent. Under these circumstances, Petitioner's statement "I think I'm gonna change

my mind," was an ambiguous invocation of the right to remain silent which the polygrapher was not required to "scrupulously honor." Berghuis, 130 S.Ct. at 2260. Accordingly, the state court did not unreasonably apply clearly established Supreme Court precedent, and there is no merit to this claim.

V.     Involuntary Confession Based on Polygrapher's Use of Implied Promises of Leniency

Petitioner contends that her confession was involuntary because the polygrapher impliedly promised that Petitioner would not be charged with homicide if she confessed. The California Court of Appeal, Fifth Appellate District issued the last reasoned decision.

A.     Last Reasoned State Court Decision

In denying the claim, the Court of Appeal stated the following:

Second, Adams contends that her statements to Brandon should be excluded because it was an involuntary confession made because of implied promises of leniency. In *People v. Williams* (1997) 16 Cal.4th 635, 659-660, the California Supreme Court held that "[a] defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. [Citations.]" Where a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary. (*People v. Boyde* (1988) 46 Cal.3d 212, 238.) In assessing the inducements allegedly offered, when the benefit pointed out is merely one which flows naturally from a truthful statement, the statement is voluntary. (*People v. Howard* (1988) 44 Cal.3d 375, 398.)

According to Adams, Brandon made statements that implied that Adams would not get charged with a homicide if Adams confessed. Brandon stated that: "We have it titled a homicide, a one eighty-seven. But when I hear it, I can't get a feel for murder here." Brandon then stated: "I get a feel for somebody wantin' somebody to change something that was livin' inside the house. Somebody was pissed off, no doubt. But I don't know that they meant for anybody to die. But, if whoever did damage to the house doesn't come forward and go[], hey I was pissed off. I, you know, I started the fire and the damn thing went out of hand. I didn't mean for anybody to die. If nobody comes forward this thing's gonna stay a homicide. It's gonna stay a homicide." Brandon later said: "So until we know what happened...this cop[']s gonna keep this thing titled a homicide." Brandon also stated that: "You know there's ... there's only one way out of situations. And it's the truth. You know that... [Adams: "Yeah."]... as well as I do. But if that person can just take that first step, as scary as it is, things have a way of getting worked out."

19

In reviewing these statements by the polygraph examiner, we conclude that there was no implied promises of leniency. We first note that Adams had been read her Miranda rights and waived them prior to the polygraph examination. (Cf. *People v. Holloway* (2004) 33 Cal.4th 96, 116-117 [distinguishing cases where there were involuntary confessions on the ground, among others, that the suspect had not waived his rights].) In examining the specific statements, we conclude that the statement that "things have a way of getting worked out" and that there is a "way out" if Adams confessed do not state or imply that the result of the confession would be that Adams would not be charged with murder or be granted some leniency such as parole or probation. Brandon's statement that she did not get a "feel for murder" in the case is also not a promise of leniency, but rather a statement about Brandon's feelings about the case. Finally, the statements that the case is "gonna stay a homicide" unless Adams admitted that she only intended to start a fire without intending to kill anybody also are not implied promises of leniency because Brandon did not state that Adams would not be charged with homicide, or that Adams would be charged only with second degree murder if Adams confessed, or that Adams would be given lenient treatment. (Cf. *People v. Cahill* (1994) 22 Cal.App.4th 296, **317-** [confession was involuntary because detective told the suspect in a burglary-murder case that he could avoid a first degree murder charge by admitting an unpremeditated murder].) Thus, we conclude that Adams's statements to Brandon were made voluntarily and not because of implied promises of leniency.

(Lod. Doc. 5 at 14-15.)

B.    Applicable Law

In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the constitution of the United States commanding that no person 'shall be compelled in any criminal case to be a witness against himself.' [Citation.] Under this test, the constitutional inquiry is not whether the confession was 'free and voluntary; that is, (it) must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.' [Citation.]

Malloy v. Hogan, 378 U.S. 1, 7 (1964); see also Hutto v. Ross, 429 U.S. 28, 30 (1976); Bram v.

United States, 168 U.S. 532, 542-543 (1897). It is clearly established federal law that the

admission of an involuntary confession violates the right of a criminal defendant to due process

under the Fourteenth Amendment. Withrow v. Williams, 507 U.S. 680, 688 (1993). To

determine if a confession is voluntary, the Court must look at the "totality of the circumstances,"

20

including "the crucial element of police coercion; the length of the interrogation; its location; its

continuity; the defendant's maturity; education; physical condition; and mental health."  Id. at

693.  A promise of leniency from interrogators may render a defendant's confession involuntary.

Moore v. Czerniak, 574 F.3d 1092, 1103 n.10 (9th Cir. 2009).  However, to be improper, any

direct or implied promises of leniency must be sufficiently compelling to overbear the suspect's

will in light of all the attendant circumstances, including the characteristics of the accused and

the details of the interrogation.  Dickerson v. United States, 530 U.S. 428, 434 (2000); see also

Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (misrepresentations by interrogators do not

render a defendant's confession involuntary where the defendant "remain[s] in control of his

responses, and there is no evidence that his will was overborne" during the interrogation.  On

habeas corpus review, the voluntariness of the confession is a legal question, however, the state

court's underlying determination that polygraph examiner's comments to petitioner were not

threats or promises is a factual finding presumed corrected under AEDPA.  Rupe v. Wood, 93

F.3d 1434, 1444 (9th Cir. 1996).

      C.     <u>Analysis</u>

     Petitioner argues that "it was represented to her that, unless she were to explain that the

death of Ms. Soult had been an unintended 'accident,' the case would 'remain a homicide.'"  She

claims the message conveyed was that if an accident occurred there could be no murder even

though death during an arson is first degree murder.  The polygrapher's statements that the case

would remain a homicide unless Petitioner admitted that she only intended to start a fire and did

not intend to kill anyone are not implied promises of leniency.  At no time did the polygrapher

state that Petitioner would not be charged with homicide, or that Petitioner would only be

charged with second degree murder, or that Petitioner would be given any other more lenient

treatment.  In fact, the polygrapher stated that the fire and subsequent death could have been an

accident or an intentional act, she did not know.  (SCT 760-761.)  The polygrapher simply

pointed out to Petitioner the potential benefit from telling the truth.  Even if improper, the interrogator's suggestion that Petitioner could benefit from telling the truth was not so compelling to overbore Petitioner's will to make a statement.  Thus, Petitioner has failed to meet her burden of demonstrating that the state court was objectively unreasonable in rejecting her claim that she involuntarily confessed due to the polygrapher's implied promises of leniency.

VI.    Statements to Detective Morgan Should Have Been Suppressed as "Fruit of the Poisonous Tree"

Petitioner contends her statements to Detective Morgan should have been excluded because they were fruit of the polygrapher's failure to honor Petitioner's invocation of her Fifth Amendment rights.

The California Court of Appeal, Fifth Appellate District, the last court to issue a reasoned decision rejected the claim because it found that Petitioner's confession was voluntary.  (Lod. Doc. 5 at 15.)

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether h[er] 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 102-103 (1975).  The Supreme Court has held that an invocation of the right to an attorney must be unequivocal.  Davis v. United States, 512 U.S. 452, 468-459 (1994).  Determining whether a suspect's Fifth Amendment right to remain silent was scrupulously honored and the legality of an officer's attempt to reinitiate questioning requires an analysis of several factors, including: whether the officer immediately ceased the original interrogation; whether a significant period of time passed before the officer resumed questioning; whether the same office resumed questioning; whether a fresh set of Miranda warnings were given; and whether the second interrogation concerned the same subject as the first.  Michigan v. Mosley, 423 U.S. at 105-106.

As an initial matter, the appellate court reasonably concluded that Petitioner did not unequivocally invoke her right to remain silent.  Rather, Petitioner simply stated, "I think I'm

gonna change my mind."  Although Petitioner expressed some reservation, she did not indicate

that she did not want to answer any questions.  Petitioner continued to answer questions by the

polygrapher, and after exiting the building to smoke a cigarette, she voluntarily returned and

proceeded with the interview by saying "Okay, let's do it" and answered all further questions

willingly.  Under these circumstances, the appellate court reasonably found that Petitioner's

ambiguous and equivocal statement did not require cessation of questioning.

Moreover, even if the polygrapher had failed to "scrupulously honor" Petitioner's alleged

invocation of the right to remain silent, Petitioner's statements to Detective Morgan would have

been admissible.  Michigan v. Mosley, 423 U.S. at 102-103.  Subsequent to the examination and

confession to the polygrapher, Detective Morgan arrested Petitioner and took her into custody.

Detective Morgan advised Petitioner of her Miranda rights prior to questioning, and Petitioner

indicated that she wished to speak with the Detective.  (SCT 242-243.)  Given the custodial arrest

and readvisement of rights and waiver by a different interrogator, Petitioner's statements to

Detective Morgan would have been admissible.  See e.g. Grooms v. Keeney, 826 F.2d 883, 886

(9th Cir. 1987) (the "crucial factor" "is the provision of a fresh set of warnings after invocation

of Miranda rights and waiver in light thereof.") (quoting United States v. Heldt, 734 F.2d 1275,

1278 n.5 (9th Cir. 1984).  Accordingly, the state courts' determination of this issue was not

contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

VII.    Ineffective Assistance of Counsel

Petitioner contends that defense counsel was ineffective because he did not fully

investigate Petitioner's claim that the victim, Soult, had been harassing her.  More specifically,

Petitioner claims that her brother, Raymond Adams, heard some of Soult's harassing messages

and, if Adams had been called to testify at trial, the outcome would have been different.

Petitioner did not raise this claim on direct review.  Rather, she presented it in the petition

for writ of habeas corpus filed in the California Supreme Court.  The California Supreme Court

1  summarily denied the claim.  In such circumstances, Petitioner must demonstrate that there was

2  no reasonable basis to deny relief.

3       The law governing ineffective assistance of counsel claims is clearly established for the

4  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe,

5  151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective

6  assistance of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S.

7  668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First,

8  the petitioner must show that counsel's performance was deficient, requiring a showing that

9  counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

10 the Sixth Amendment. Strickland, 466 U.S. at 687.  The petitioner must show that counsel's

11 representation fell below an objective standard of reasonableness, and must identify counsel's

12 alleged acts or omissions that were not the result of reasonable professional judgment

13 considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

14 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court

15 indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

16 professional assistance.  Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v.

17 Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

18      Second, the petitioner must show that counsel's errors were so egregious as to deprive

19 defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court must

20 also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's

21 ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356,

22 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance

23 was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that

24 (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would

25 have been different.

26

27                                           24

28

1    A court need not determine whether counsel's performance was deficient before

2    examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

3    Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove

4    prejudice, any deficiency that does not result in prejudice must necessarily fail.

5        There is no showing that counsel was deficient or that Petitioner was prejudiced by the

6    failure to call her brother to testify.  Contrary to Petitioner's assertion, her claims that Soult was

7    harassing her were corroborated at trial.  Three objective witnesses testified about the

8    harassment.  Joseph Lopes, Soult's son, told Detective Morgan that Soult would sometimes

9    phone and threatened Petitioner, saying things like "Susie Q. do you want to come out and play

10   with me?" (Lod. Doc. 5, at 9.)   Lopes also told Detective Morgan that Petitioner and Soult were

11   supposed to meet at a park "to fight," but Petitioner did not show up. (Id.)  He also told Detective

12   Morgan that Soult bragged about following Petitioner to her job.  Glenda Oleson, a friend of

13   Soult, told Detective Morgan that Soult admitted to testing and threatening Petitioner and

14   following Petitioner to her job.  (Id.)  Further, a custodian of record for Soult's cellular telephone

15   company testified that the call detail records showed that Soult had made two telephone calls to

16   Petitioner in May of 2004.  (Id.)  In closing argument, the prosecutor admitted that Soult had

17   made some phone calls sporadically over two years.  (RT 527.)  Therefore, Petitioner's claim that

18   Soult had been calling and harassing her was substantially corroborated at trial.  Thus, there was

19   no basis for counsel to present further evidence and Petitioner has not established a reasonable

20   probability the result of the proceeding would have been different.  Strickland, 466 U.S. 694-695.

22                                    RECOMMENDATION

23       Based on the foregoing, it is HEREBY RECOMMENDED that:

24   1.      The instant petition for writ of habeas corpus be DENIED; and

25   2.      The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


        IT IS SO ORDERED.

    **Dated:**   **July 21, 2011**          _____ **/s/ Dennis L. Beck** _____
                                          UNITED STATES MAGISTRATE JUDGE

26